**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **V.** | : | **CRIM. NO.  19CR316 (SRU)** |
| | : | |
| | : | |
| **WILLIAMS S. PALMIERI** | : | **JUNE 29, 2020** |

<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**</u>

The defendant, William Palmieri, is a fifty-six-year-old, single parent, with significant health issues, who is the sole caregiver and source of support to his two teenage children.  He comes before a criminal court for the first time in his life, following his guilty pleas on December 19, 2019 to two misdemeanor counts of willful failure to pay federal income taxes, in violation of 26 U.S.C. § 7203.  *See* ECF Nos. 2, 4.  In the plea agreement, the parties gave agreed that the United States Sentencing Guidelines (the "Guidelines") set forth an advisory guideline range of 12-18 months, and they have reserved their respective rights to make whatever arguments might be appropriate for a departure or non-Guidelines sentence.

As set forth below, we respectfully submit that a probationary sentence, with a special condition of home confinement, and an order of restitution, is a reasonable sentence that is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

<u>**Argument**</u>

A sentencing court is obligated to fashion a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. §3553(a).  As a procedural matter, "'[a] district court should begin all sentencing

proceedings by correctly calculating the applicable Guidelines range.'" *United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)); *see also Rita v. United States*, 551 U.S. 338, 351 (2007).  Next, the court must determine whether or not to apply any of the Guidelines' departure policy statements to adjust the Guideline range.  *See generally* U.S.S.G. §1B1.1(a)-(c). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party," including whether a non-Guidelines sentenced is warranted.  *See Gall*, 552 U.S. at 49-50; *see also Dorvee*, 616 F.3d at 174.  "In so doing, [the district judge] may not presume that the Guidelines range is reasonable," but instead he should "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  "After announcing the sentence, the judge 'must adequately explain the chosen sentence to allow for meaningful appellate review.'" *Dorvee*, 616 F.3d at 174 (quoting *Gall*, 552 U.S. at 50); *see also Rita*, 551 U.S. at 356-57 ("when a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation").

A sentence that is "sufficient, but not greater than necessary" under 18 U.S.C. §3553(a) is the lowest possible sentence that accounts for all of the relevant statutory factors.  In other words, if a district court believes a lower sentence will be as effective as a higher sentence in light of the relevant factors, it must choose the lower sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006)("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher.").

2

I.  **A SENTENCE OF PROBATION AND AN ORDER OF RESTITUTION, WITH A PERIOD OF HOME CONFINEMENT, IS CONSISTENT WITH THE SENTENCING FACTORS SET FORTH IN 18 U.S.C §3553(a)**

In determining what sentence will best achieve the statutory purposes of

sentencing, the Court must consider the following sentencing factors:

1.  The nature and circumstances of the offense and the history and characteristics of the defendant;
2.  The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;
3.  Pertinent policy statements issued by the Sentencing Commission;
4.  The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and
5.  The need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1), (a)(3) - (a)(7).

A.  **Mr. Palmieri's Personal Background, Family Responsibilities, and Physical and Mental Health**

Mr. Palmieri is now 56 years old.  He grew up in Hamden, Connecticut and has

spent his whole life, with the exception of law school, working and living in the New

Haven area.  He, along with his sister, attended St. Thomas Day School in New Haven,

where his mother was a teacher for thirty years.  His childhood was not without difficulty,

however, as his mother was physically and verbally abusive toward Mr. Palmieri.  When

his father sought to intercede, this caused significant family conflict.  *See* PSR ¶43.

Fortunately, he had a very close relationship with his father and his father's family, so

Mr. Palmieri moved in with his grandparents when he was 15 years old.  He developed

a very close bond with his grandmother, who essentially raised Mr. Palmieri from the

time he was a teenager.

Despite the frequent family conflict, Mr. Palmieri's parents fought hard to make

sure that their children received a good education.  Mr. Palmieri's mother continued to

work at St. Thomas so that Mr. Palmieri and his sister could attend private school. Mr. Palmieri's father was an electrician, working for a family business, and he became a builder. He also ran a machine tool business, making an attachment for a machine called a surface grinder that Mr. Palmieri's maternal grandfather invented, and which Mr. Palmieri's father ultimately perfected. Mr. Palmieri's father manufactured it, promoted and sold it, and ran a small company on his own. In addition to their careers, Mr. Palmieri's working-class parents managed to get masters' degrees. They also managed to send Mr. Palmieri to the Hopkins School in New Haven. This gift of education had a significant impact on Mr. Palmieri. In fact, the way in which his parents overcame their interpersonal problems to ensure that their children received the best education possible was something that Mr. Palmieri has tried to emulate as a parent with his own children, sending his daughter to Hopkins since the seventh grade and sacrificing everything to give her the same opportunities that he had.

After graduating from the Hopkins School, Mr. Palmieri graduated from Albertus Magnus and attended law school at Vermont Law School, where he graduated in 1993. It was there that he met and began a romantic relationship with a law school classmate who was one year behind Mr. Palmieri. Although they never married, the relationship was a committed one and it would last until 2015, when they separated. They have two young children together: a daughter, M.P. (now 18) and a son, B.P. (now 15). Unfortunately, as we discuss in more detail below, their mother's mental health problems, employment instability, and other issues, led to major problems within the family home. This eventually contributed to the end of the relationship and resulted in a

court-approved child custody agreement in 2016 that gave Mr. Palmieri primary physical custody with some visitation for the children's mother.

### Mr. Palmieri Starts A Family and Starts His Solo Practice

Mr. Palmieri began as a practicing lawyer in Connecticut in 1994.  His primary areas of practice have always been employment discrimination and civil rights litigation, with some state court criminal defense.  He started his career with John Williams, Esq. in New Haven, gaining significant client and courtroom experience, but he did not learn the business side of a managing a law practice, including managing cash flow, maintenance of bookkeeping records, and good IOLTA management.

In or about late 2001, Mr. Palmieri parted ways with Attorney Williams.  At the time of his departure, Mr. Palmieri and his partner, who was pregnant with their first child, had purchased property in Bethany to build a house.  It was a very busy and hectic time, but Mr. Palmieri managed to survive professionally and he and his partner were able to finish building their home.  The home is the same residence at 270 Wooding Hill Road where Mr. Palmieri still resides to this day with his two children.

From 2002 through 2009, Mr. Palmieri struggled to maintain a sense of normalcy and stability in the family home, while his partner struggled to hold down a job.  She would get jobs for very short periods of time and then get fired.  There would be long layovers in between jobs and things would always get more difficult and stressful in the home.  Mr. Palmieri's partner never contributed much at all financially and, during the times that she was not employed, she was financially irresponsible.  The job of maintaining order fell upon Mr. Palmieri—who was not particularly organized himself— and he was frequently distracted with work and trying to deal with emotional drama at

home.  The situation in the home deteriorated significantly, as discussed at length in Mr. Palmieri's personal statement to the Court and in the PSR.  *See* PSR ¶46.

Against this backdrop, and the nonstop running required to keep his trial-heavy law practice going, Mr. Palmieri's timely payment of bills, his bookkeeping, and timely filing and payment of taxes suffered.  Amidst all the chaos, Mr. Palmieri simply could not summon the necessary organization and discipline to get things in order.

### Health Issues, Breakdown of the Family, and Financial Trouble

Things got worse in 2009, when Mr. Palmieri became gravely ill.  He was sitting in his office on a Friday evening in late December 2009 and he was shivering violently, in pain, and sweating.  Mr. Palmieri had been having stomach pains that day, but his condition that evening alarmed his secretary and she urged Mr. Palmieri to go to the hospital immediately, or at least to see his doctor.  He ended up in Yale Emergency Room and he was prepped for emergency surgery overnight.  Three diverticulae on his colon had ruptured, and the contents of his bowels were emptying into his body, poisoning his bloodstream.  Surgery was later postponed out of concern that Mr. Palmieri's infection was too severe, making surgery too risky.  Instead, his doctors sought to get his white blood count down, reduce the inflammation, and perform surgery when he was healthy enough.  He was in the hospital for a month, and it was touch and go at times.  They could not control the infection and his fever was extremely high.

After things got somewhat under control, he was sent home from the hospital, but he was still bedridden, and still too inflamed for surgery. He was given a regimen of strong antibiotics, Cipro and Flagyl among them, and the hope was that he would soon be healthy enough to tolerate surgery.  *See* PSR ¶51.  As it turned out, the process

dragged on for most of 2010.  He was hospitalized at least four times, with repeated recurrences of the diverticulitis, and the attendant swelling, pain, and infection.  After each hospitalization, he returned home, but was still bedridden.  Finally, his physician decided that Mr. Palmieri was ready for surgery and, on the eve of another attack, he was brought in for surgery.  The surgery lasted six-an-a-half hours and doctors removed eighteen inches of his colon.  Due to the prior trauma, the damaged colon had become attached to his stomach and other organs, further complicating the surgery.  But the surgery was ultimately successful.  *See* PSR ¶51.

After a lengthy recovery, Mr. Palmieri slowly transitioned back into his office. Making things more stressful, however, was the fact that Mr. Palmieri's partner was fired from another job and she assured Mr. Palmieri that she had access to COBRA to cover medical expenses.  This turned out not to be true.  She had not paid the COBRA premium and none of Mr. Palmieri's surgery, hospitalizations, and medical care was covered by insurance, adding to the financial burden of the household.

Not too long after Mr. Palmieri returned to relative health, his partner's mental health took a turn for the worse, requiring hospitalization.  *See* PSR ¶47.  She was ultimately discharged to Mr. Palmieri's custody.  During this time, all of the responsibility for the kids, his office, the home, bills and everything else, fell to Mr. Palmieri alone.

The additional stress began to take its toll.  Mr. Palmieri had previously been diagnosed with serious hypertension.  He had been prescribed a medication, which would work for a while, and then stop working.  As his condition worsened, he became prediabetic, and then diabetic.  Diabetes is rampant in his family.  His grandmother and all of her siblings and his uncle had it, causing loss of limbs, vision, and death among

them.  Mr. Palmieri is stable, but he is morbidly obese and he continues to take numerous medications (ten medications in all) for asthma, hypercholesterolemia, hypertension, diabetes, and for chronic back problems.  *See* PSR ¶54.  Mr. Palmieri and his family have been without health insurance for many years and only recently obtained health insurance for a period of time in 2019.  During the intervening years, Mr. Palmieri was paying all of his medical bills, his children's medical bills, and, when he was still together with his partner, for her prescriptions and treatment.

Throughout the stress and turmoil, Mr. Palmieri tried his best to keep his kids in what passed as normal life.  He drove them to and from school daily, and to their various activities and lessons after school.  His daughter entered Hopkins in 2014, a decision that was probably financially unrealistic at the time, but Mr. Palmieri—perhaps out of reverence for his parents' own sacrifice for him, or out of guilt for what his relationship with their mother was doing to his children—wanted to give his daughter all the opportunities that he had, including a Hopkins education.

Mr. Palmieri went to marital counseling with his partner and tried to work things out, but the relationship was not repairable.  They finally separated in April 2015 and she moved out.  *See* PSR ¶47.  Mr. Palmieri's children were thirteen and ten.  Their mother moved around the corner to another place in Bethany.  During this time, in 2014 and 2015, Mr. Palmieri was consumed with trying to protect his children from the disastrous and destructive relationship with his former partner.  Several of the character

letters submitted to the Court corroborate Mr. Palmieri's devotion as a father, even

during these difficult times.[1]

> His sister, Melissa Stone writes:

> Bill has always been a kind, generous and thoughtful person, almost to a fault. Because of this he found himself with a partner who suffers from severe mental illness. This has required Bill to serve as the sole parent and provider for many years. Under his guidance, and his alone, McKinley and Barrett have blossomed into intelligent, kind, respectful young adults. As a stay at home mother myself, I am aware of the work that goes into taking care of the many needs teenagers have. I have always been impressed at how Bill has been able to work a full day and yet still be a full-time parent, not an easy task. [M.P.], 18 and [B.P.,] 15 are both great kids and both adore their father. Despite the responsibilities of his professional office he has always been available to take them to and from their schools and extracurricular activities, as well as their social events.

Ltr. from M. Stone.

> Mr. Palmieri's close friend of 44 years, David Cantor, makes a similar

observation in his letter:

> Even during these stressful circumstances, Bill remained a jovial and big-hearted person, hosted many holiday gatherings for family and friends, and continued to always ask how others were doing. Bill showed his resilience and values by putting all his energies into raising his children, providing for them, spending time with and mentoring them, and most importantly loving them unconditionally.  They are today two smart, personable, self-reliant teenagers. As you are likely aware, he is a sole practitioner attorney and is fully responsible for their welfare. Their mother sees them at most once a week and is not financially able to care for them or, in my opinion, stable enough to parent them.

Letter from D. Cantor.

> Even his professional colleagues were impressed by what seemed to be

an incredible balancing act:

---

[1] Mr. Palmieri's personal statement to the Court and the various character letters submitted on his behalf have been provided to the U.S. Probation Office and the Government, with the understanding that they will be forwarded to the Court as additional confidential PSR material, or attached as an addendum to the PSR.

As a lawyer and colleague, Attorney Palmieri and I have often been on the opposite sides of hotly-contested civil cases. Despite our frequent disagreements, Attorney Palmieri has always acted honorably and never with questionable ethics. I have been impressed with his candor and demeanor while zealously advocating for his clients, many of whom were struggling with a variety of medical, cultural and economic disadvantages. I have witnessed Attorney Palmieri to act in good faith and with respect, fairness and decency toward counsel, the parties and the court at all times.

Throughout the course of these cases, and many hours spent together while working on them, Attorney Palmieri and I also established a friendship that has provided me the opportunity to get to know him, and his children, personally, especially because we share an interest in and passion for music.  Although Attorney Palmieri confided about difficulties in his marriage, he was clear that his number one priority was being a supportive and loving father to his children, and trying to minimize any negative effects they might suffer from the divorce. He was always focused on providing opportunities for them. I have been impressed to observe the strong and loving relationship he has maintained with them, as well as how mature, respectful and thoughtful they are.

Ltr. from K. Shea, Esq.

What Mr. Palmieri's family, close friends, and colleagues did not know was that Mr. Palmieri was struggling to balance his personal and professional obligations.  He found it harder and harder to go into the office, and to keep up with all of his responsibilities, including his taxes.  He let his law practice slip.  He did not return phone calls, he was frequently out of the office, he lost his law firm web site for nonpayment, his secretary quit, and many bills went unpaid.  Around this time, his house went into foreclosure for the first time.  His elderly aunt helped him pay what was in arrears and he got the house out of foreclosure.  He let other bills go at the office and he went into arrears with his office landlord.  Looking back now, Mr. Palmieri recognizes that he was (and still is) suffering from depression and overwhelming anxiety.

10

To cope with the stress and anxiety, Mr. Palmieri immersed himself in buying pointless things and music memorabilia, particularly books and records.  *See* PSR ¶15. He bought obsessively and often without much thought because it made him feel better and it was a pleasant distraction from the turmoil in his personal life.  There were no extravagant purchases: no country club memberships, no second homes, no lavish vacations.  Instead, there was spending beyond his means and poor financial management that interfered with his ability to pay for essential bills, including his taxes.

The IRS also was engaged in collection during this time, and it escalated to levies in late 2014 and 2015.  *See* PSR ¶¶11-12 (discussing some of the levy activity). Amidst all the other turmoil in his life, Mr. Palmieri accepted it as another unfortunate fact of his life.  In 2015, in an effort to avoid further levies and get his tax situation under control, Mr. Palmieri hired a New Haven law firm specializing in tax law.  This was an important first step.  With the assistance of counsel, he brought his filings into compliance for the years 2009 through 2014, but he still owed substantial taxes for 2006 and 2009 through 2014, with interest and penalties continuing to accrue.

### *Family Court Litigation*

In 2015-2016, while Mr. Palmieri was still in collections with the IRS, he attempted to negotiate his tax debt using his available assets (including a formal proposal to civil enforcement authorities), but his tax situation quickly retreated into the background while he spent most of 2016 in contentious family litigation related to the custody of his two children.  That family court litigation resulted in a stipulated agreement in 2016 (approved by the family court) awarding Mr. Palmieri custody of his children.  But the agreement also imposed significant financial burdens on Mr. Palmieri,

11

and he has faltered under its strain.  In exchange for allowing Mr. Palmieri and the children to live at the family residence at Wooding Hill Road, Mr. Palmieri agreed to pay for all of the children's expenses (educational, medical, clothing, food) and to pay 100% of the mortgage (which is nearly $4,000 per month).  Both Mr. Palmieri and his former partner are co-borrowers on the mortgage, but, until earlier this month, the property was in his partner's name only.  In the family court proceedings, it was agreed that Mr. Palmieri would attempt to refinance and/or assume the mortgage on the property, in order to remove his partner from the mortgage obligation, and Mr. Palmieri would receive sole title to the property.  Unfortunately, Mr. Palmieri's financial burdens and disputes over who would receive the equity in the property delayed the property being transferred into Mr. Palmieri's name.

After settling the family court litigation in 2016, Mr. Palmieri attempted to pay what he viewed at the time to be his most pressing financial obligations: his family's living expenses, his mortgage, and his daughter's tuition at Hopkins.   In 2017, while he made these other expenditures, he stopped paying his office rent.  After he failed to pay rent for February, March, April, May, June, July, August, and September, his landlord commenced eviction proceedings.  *See 129 Church Street, LLC v. William Palmieri, dba Law Offices of William S. Palmieri*, NHH-CV17-6005788-S.  Judgment entered against him in November 2017, but he was able to remain in the space for several more months, eventually vacating in May 2018.  He also fell behind on the residential mortgage.  Four months after the commercial eviction, in September 2018, his mortgage servicer filed a foreclosure action against Mr. Palmieri and the mother of his

children.  *See Prof-2013-S3 Legal Title Trust V, By U.S. Nat'l Bank Ass'n, v. Palmieri, et al.*, NNH-CV18-6084328-S.

### *Accepting Responsibility and Addressing His Tax Debt*

In 2017, Mr. Palmieri learned that his case had been referred for criminal investigation by tax authorities.  In late 2018, after his house went into foreclosure, he received formal notice from the U.S. Attorney's Office that he was being investigated for criminal tax violations.  He promptly retained the undersigned as counsel, paid for a new accountant, and he began the slow and painful process of bringing his tax filings into compliance for 2015-2018.

He also assembled a game plan to pay his tax debt.  A critical piece of this game plan was avoiding a foreclosure on the family residence in Bethany and getting title to the property back into his name.  The Bethany property is a four-bedroom, two-bathroom home on eleven acres of land. The appraised value of the property is $548,066 and the assessed value is $383,650. Over the years, Mr. Palmieri has paid the mortgage and maintained the equity in the home, but title was not in his name due to the agreement with the mother of his children, as noted above.

Since pleading guilty in December 2019, Mr. Palmieri has positioned the property to secure payment of his tax debt.  First, although the foreclosure case remains pending, Mr. Palmieri was able to negotiate a six-month forbearance agreement in February 2020, prior to the COVID-19 pandemic.  Mr. Palmieri saved the sizeable lump sum payment required under the agreement and paid it earlier this year.  *See* PSR ¶45. Second, as a result of Mr. Palmieri's significant efforts to avid a foreclosure, his partner agreed to transfer the property to Mr. Palmieri via quit claim deed.  Previously, title to

13

the Bethany residence was in the name of his partner, pursuant to a family court separation agreement.  At that time, a quit claim deed was executed and held in escrow.  In May 2020, it was agreed in writing that the quit claim could be recorded and the property transferred into Mr. Palmieri's name.  With his ex-partner's consent and agreement, Mr. Palmieri recorded the quit claim deed on June 12, 2020, effectuating a transfer of the property into Mr. Palmieri's name only.

Mr. Palmieri's efforts over the past 6-8 months now provide security for the amounts owed to the IRS and will enhance Mr. Palmieri's ability to make restitution. After the six-month forbearance period expires in October, Mr. Palmieri plans to discuss having the loan formally reinstated and to explore refinancing the mortgage to get a better mortgage rate and so that he can use the substantial equity preserved through his efforts (estimated to be about $250,000 to $300,000) to pay his IRS tax debt and criminal restitution.  Defense counsel has notified the IRS of the property transfer and spoke directly with an IRS revenue officer responsible for restitution/probation civil enforcement.  This revenue officer informed defense counsel that the IRS would not file a lien on the property in the ordinary course, but she confirmed that the IRS would be secured and protected by the lien to be filed by the U.S. Attorney's Office after sentencing, which would be filed to secure payment of the $227,709 in tax restitution agreed to in the plea agreement.  Accordingly, if Mr. Palmieri is unsuccessful in refinancing the mortgage in the future to pay the restitution, and he is forced to sell the home, the IRS restitution can be paid using the substantial equity in the property (currently between $250,000 to $300,000).  In other words, although Mr. Palmieri is financially unable to write a check to pay his tax debt today, he has done everything in

14

his power to do the next best thing: provide adequate security for the IRS to be paid *in full* using the house.

### *Attorney Disciplinary Proceedings and Possible Consequences*

Because Mr. Palmieri has pled guilty to tax misdemeanors involving failure to pay taxes under 26 U.S.C. §7203, and his plea agreement does not mandate incarceration, he has not been subjected to an interim suspension of his right to practice law.  *See* Practice Book §2-41; D. Conn. L. Rule 83.2(e)4.  The Connecticut Office of Chief Disciplinary Counsel has filed a presentment, but the parties have agreed to await the conclusion of Mr. Palmieri's criminal sentencing before proceeding further.  *See Office of Chief Disciplinary Counsel v. Palmieri*, Docket No. NNH-CV-20-6099862-S (New Haven. J.D.).  The Federal Grievance Committee has not filed a presentment yet, but instead is awaiting the conclusion of the criminal sentencing before seeking an interim suspension and/or seeking reciprocal discipline.  The U.S. Court of Appeals for the Second Circuit initially entered an interim suspension order, but agreed to vacate it subject to certain interim conditions.  Those conditions included (a) a condition that Mr. Palmieri not appear or represent any clients before the Court of Appeals unless he is first granted leave to do so by the court, and (b) a condition that, within 28 days of this sentencing, Mr. Palmieri submit a detailed declaration setting forth various information, including a list of clients represented in the court since 2010, a summary of any discipline in other jurisdictions, and an explanation of his tax misconduct. Notwithstanding this order, the Grievance Panel of the Second Circuit issued an order earlier this month allowing Mr. Palmieri to represent a client in an interlocutory appeal.

By virtue of the foregoing, Mr. Palmieri has been permitted to continue practicing law since the date of his plea in December 2019.  Moreover, as noted above, he has used the opportunity productively, to enhance his ability to make restitution.  If he is sentenced to incarceration, however, the ripple effects will be swift and severe.  He will be suspended on an interim basis in all jurisdictions; his conviction and sentence will require a suspension of his right to practice; he will not able to reapply for admission until he has completed his sentence (including any period of supervised release),[2] his house will be lost to foreclosure, and his children will need to live with Mr. Palmieri's elderly father, or, contrary to the wishes of mental health professionals and his own children, with their mother.  Mr. Palmieri has been motivated since November 7, 2018, when he first was notified of this criminal investigation, to avoid this most punitive of outcomes.

## B.    Nature and Circumstances of the Offense

The statute at issue in this case, 26 U.S.C. §7203, "makes it a misdemeanor willfully to fail to perform a number of specified acts at the time required by law," *Sansone v. United States*, 380 U.S. 343, 351 (1965), including a failure to pay a tax when due.  "In order to establish willfulness, the government is required to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *United States v. Klausner*, 80 F.3d

---

[2] If Mr. Palmieri is suspended for one year or more in state court, he would need to apply for reinstatement pursuant to Practice Book §2-47A, and consideration of the application would be governed by Practice Book §2-53.  Subsection (4) of Practice Book §2-53 states that, unless otherwise ordered by the court, an application cannot be filed unless "[t]The applicant has successfully completed any criminal sentence including, but not limited to, a sentence of incarceration, probation, parole, supervised release, or period of sex offender registration and has fully complied with any orders regarding conditions, restitution, criminal penalties or fines…."

55, 62 (2d Cir.1996) (internal quotation marks omitted).   Thus, where a taxpayer—like
Mr. Palmieri—has enough money to pay some or all of his taxes, knows that he owes
the taxes, but chooses instead to engage in discretionary spending without paying his
taxes, he commits the tax crime of willful nonpayment.   The crime does not require
proof of fraud or concealment of income.   Indeed, "[t]he government advises its [own]
attorneys that '[o]bstinately refusing to pay taxes due, possession of the funds needed
to pay the taxes, or even the open assignment of the income, without more, merely
constitute a willful failure to pay taxes ....'" *United States v. McGill*, 964 F.2d 222, 230
(3d Cir. 1992), as amended (May 19, 1992), as amended (June 24, 1992) (citing U.S.
Dept. of Justice, Criminal Tax Manual, § 8.04 at 8-7, 8-8 (6th ed.1985).[3]

The parties have addressed their respective views about the nature of the
offense in the PSR.  *See* PSR ¶¶5-16, 19.  In this case, the offense of conviction does
not involve other criminal activity (such as theft from clients or other fraud), there was no
underreporting of income, and no false tax returns.  Mr. Palmieri is not a tax cheat.
Although Mr. Palmieri was clearly aware of his obligation to file and pay taxes, the very
serious issues in his personal life, his serious health issues, and his own mental health
caused him to push aside the obligation in favor of addressing the most pressing
financial issues directly impacting his children.  As discussed in the PSR, most of the
unpaid tax at issue went towards paying his mortgage ($4,000 per month) and his

---

[3] See U.S. Dept. of Justice, *Criminal Tax Manual*, § 8.06[2] (2012) (updated Jan. 2016), available at
https://www.justice.gov/sites/default/files/tax/legacy/2015/03/26/CTM%20TOC.pdf, ("Obstinately refusing
to pay taxes due and possession of the funds needed to pay the taxes, without more, does not establish
the requisite affirmative act necessary for an attempted evasion of payment  charge.").  *Accord United
States v. Hoskins*, 654 F.3d 1086, 1091 (11th Cir. 2011) (evasion of assessment case) (a defendant must
do more than passively fail to file a tax return, the statute also "requires a positive act of commission
designed to mislead or conceal").

daughter's private school tuition from 2014-2017 ($167,431).  Most of this money, which should have been used to pay taxes during the relevant years, will now be paid to the IRS.  The house, which is finally in Mr. Palmieri's name, will be subject to a lien to secure payment of the taxes owed for 2009-2014 ($141,474.53), and, appropriately, he will pay substantial interest and penalties ($86,234.47) on top of the tax due for those years. Indeed, the interest and penalties, which Mr. Palmieri has agreed to pay in the plea agreement, make up approximately *60%* of the total agreed-upon tax loss of $227,709.

Thus, compared to the typical criminal tax case—which involves a felony, fraudulent conduct, concealment or underreporting of income, tax evasion, or false filings—Mr. Palmieri's case is outside the heartland.  It involved choosing to pay his mortgage, purchasing a used car to replace a broken one, and making other substantial discretionary payments (like his daughter's private school tuition) instead of paying his taxes.  He also did not file his tax returns in a timely fashion.  As discussed above, this conduct was due primarily to his own personal shortcomings, the chaos in his personal life, and his failure to manage his finances properly and budget for timely payment of his taxes.

### C.     The Kinds of Sentences Available

A violation of 26 U.S.C. § 7203 is a Class A misdemeanor.  *See* 18 U.S.C. § 3559(a)(6).  Under 18 U.S.C. § 3561(a)(1) and (c)(1), Congress has said that a person convicted of this misdemeanor offense is eligible for a sentence of straight probation of not more than five years.  As a condition of probation, the Court may also impose a number of specialized conditions attendant to a sentence of probation, including

vocational training, restitution, community service, and home detention/confinement. 18 U.S.C. § 3563(b).

Because Mr. Palmieri is in Zone C of the Sentencing Table, the Court can satisfy the requirements of the Guidelines—if the Court concludes that a Guidelines sentence is warranted—by imposing a "sentence of 6 months imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for a period of 6 months."  *See* PSR ¶79; U.S.S.G. §5C1.1(d)(2).

We submit, however, that the Court can fashion a non-custodial sentence that is sufficient to accomplish the goals of sentencing in a misdemeanor case such as this. Contrary to popular perception, the non-custodial portion of the sentence is indeed "punishment" under our federal sentencing laws.  In *Gall v. United States*, the U.S. Supreme Court squarely rejected the notion that probation and other non-custodial sentences are not punishment under 18 U.S.C. §3553(a):

> Offenders on probation are nonetheless subject to several conditions that substantially restrict their liberty . . . Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled . . . . Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.  Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 552 U.S. at 48-49; *see also* ABA Standards on Criminal Justice, Sentencing 18-6.4(a), p. 227 (3rd ed. 1994) ("A sentencing court should prefer sanctions not involving total confinement in the absence of affirmative reasons to the contrary.").

In addition to the Supreme Court, Congress has observed that alternatives to incarceration should be explored prior to imposing a sentence of imprisonment. As part of the Sentencing Reform Act of 1984, Congress recognized "the general appropriateness of imposing a sentence other than imprisonment" where, as here, the defendant has no criminal history and is convicted of a non-violent offense. Thus, even before the unique concerns surrounding a defendant's risk of serious infection or death from COVID-19, a sentence of probation and restitution, with conditions, was deemed consistent with Congressional intent and the purposes of 18 U.S.C. §3553(a). Today, especially in light of Mr. Palmieri's multiple health issues and unique vulnerability to serious complications from COVID-19, exploration of non-incarceration alternative is even more appropriate.

An alternative to incarceration is important for another reason: it is the only way to preserve Mr. Palmieri's ability to continue working as a lawyer. As discussed above, if Mr. Palmieri is sentenced to incarceration and a period of supervised release, he will be suspended for a period of time and his legal career will essentially be over, making it much more likely that he will be unable to support his family and pay his taxes.

### D.    The Need to Avoid Unwarranted Disparities

Pursuant to §3553(a)(6), a sentencing court must also take into account "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and this extends to defendants sentenced within the same case. See *Gall*, 128 S.Ct. at 600; *see also United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007) ("the plain language of §3553(a)(6) does not on

its face restrict the kinds of disparity a court may consider"); *United States v. Fernandez*, 443 F.3d 19, 31 n. 9 (2d Cir. 2006) (same).

Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing.  "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing."  U.S. Sent. Comm'n, *Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).  Thus, while this factor calls for equal treatment for similarly situated offenders, "it is worth noting that equal treatment consists not only of treating like things alike, but also of treating unlike things differently according to their differences."  *United States v. Irey*, 612 F.3d 1160, 1205 (11th Cir. 2010)(en banc).

No unwarranted disparities would be created within this case through the imposition of a probationary sentence.  In fiscal year 2019, the median loss for tax fraud offenders was $296,429, and 59.3% of tax fraud offenders received a non-Guidelines sentence.  Of those receiving downward variances, the average sentence reduction was 61%.  And 35% of all tax fraud offenders in 2019 (*i.e.*, non-misdemeanor cases) received non-incarceration sentences.[4]

Here, Mr. Palmieri's offenses are misdemeanors.  He did not commit felony tax fraud, and the tax due for the relevant years is $141,474.53.  Even with the substantial

---

[4] *See* U.S. Sent. Comm'n, "Quick Facts: Tax Fraud Offenses," available at
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY19.pdf
(last accessed June 27, 2020).

penalties and interest of $86,234.47, his total tax loss is below the national median.

Moreover, given the nature of his offense, including him in the 35% of cases that

receive non-jail sentences is appropriate.

Also lending support to a probationary sentence in this case is the fact that

judges in this District have found probation-only sentences to be appropriate, oftentimes

imposing an initial period of home confinement. *See, e.g., United States v. Eddie Chan,*

17-cr-234 (JAM) (May 1, 2018) (imposing sentence of 5 years' probation where tax loss

was $78,214 in felony false tax return case); *United States v. Michael Weinstein*, 12-cr-

214 (JCH) (January 10, 2013) (imposing sentence of 2 years' probation, with 6 months'

home confinement, where tax loss was $51,640 and defendant had adjusted offense

level of 12); *United States v. Danielle Faux*, 14-cr-28 (SRU) (June 5, 2017) (imposing

sentence of 2 years' probation, with 6 months' home confinement, where tax loss was

$77,640 and defendant had total adjusted offense level of 16); *United States v. Agostino*

*Incorvaia,* 15-cr-56 (VAB) (August 10, 2015) (imposing sentence of 3 years' probation,

with 6 months' home confinement in a felony tax evasion case where tax loss was

$396,650).

At least one court in this District imposed a prison sentence of 12 months and

one day on an attorney who, like Mr. Palmieri, pled guilty to willful failure to pay taxes.

*See United States v. Michael Sherman*, 3:10-CR146 (JCH) (December 12, 2010).

Although there may be some similarities, the facts in the *Sherman* case are ultimately

distinguishable from Mr. Palmieri's case.  In *Sherman*, the tax loss was significantly

higher.  The attorney stipulated to unpaid taxes of $420,710 over a two-year period,

plus interest and penalties.[5]  As a result, his sentencing exposure was 24-30 months, which was more than the 24-month consecutive statutory maximum for the two misdemeanors to which he pleaded guilty.  The attorney also earned substantial income during the period of nonpayment, but paid practically nothing, paying only $346 in withholding when he earned over $1 million.[6]

In this case, it is evident that while Mr. Palmieri did not pay his taxes, his tax loss, even with interest and penalties, is roughly ***$200,000 less*** than the loss at issue in *Sherman*.  Moreover, Mr. Palmieri's advisory range is only 12-18 months, which is about half the sentencing exposure of the defendant in *Sherman*.  These facts, together with the other mitigating information discussed herein—including Mr. Palmieri's personal background, his health, and his extraordinary family circumstances—demonstrate that any slight disparity created by a lesser sentence for Mr. Palmieri is a ***warranted*** disparity, and not an unwarranted one.

### E.    The Need for Restitution

There is a sizeable restitution order in this case, which includes substantial interest and penalties.  It is not mandatory, but Mr. Palmieri has agreed to it, demonstrating his sincere acceptance of responsibility.  A non-custodial sentence would enhance his ability to make restitution and it would increase the likelihood that he will be able to make full restitution and stay current with his taxes in 2019 and forward.

---

[5] *See* Sherman, ECF No. 4 (Plea Agreement).
[6] *See id.*, ECF No. 23 at 2-3 (Gov't Sentencing Memorandum).

### F.      Consideration of the Sentencing Guidelines

With regard to this sentencing factor, the parties and the U.S. Probation Office agree that the Guidelines in Mr. Palmieri's case yield an advisory range of 12-18 months of imprisonment.  *See* PSR ¶79.  The task for the Court will be to decide whether a sentence within the advisory ranges is warranted, and, if it is not, to explain why a different sentence also satisfies all of the statutory factors under 18 U.S.C. §3553(a).  "In so doing, [the Court] may not presume that the Guidelines range is reasonable," but instead it should "make an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 50 (2007).

In this case, the Court should consider departing to Zone B of the Sentencing Table, which explicitly permits a probationary sentence, *see* U.S.S.G. §5B1.1(b), or impose a non-Guidelines sentence for reasons already discussed.  To the extent additional mitigating factors or departures are needed to warrant such a sentence, the Court should consider the following:

### 1.      **Extraordinary family circumstances**

Mr. Palmieri's central role in supporting his two young children, and the collateral financial and emotional damage that would accompany his incarceration, support either a downward departure or a non-Guidelines sentence.  *See, e.g.*, *United States v. Galante*, 111 F.3d 1029, 1032 (2d Cir. 1997) (affirming downward departure of thirteen levels based on the defendant's familial obligations and his role as the primary caregiver); *United States v. Alba*, 933 F.2d 1117, 1121 (2d Cir. 1991) (affirming departure from range of 41-51 months imprisonment to six months halfway house based, in part, on the fact that "[the defendant's] incarceration would result in the

destruction of the family whose strength and stability primarily depend on him"); *United States v. Gerard*, 782 F. Supp. 913, 914-15 (S.D.N.Y. 1992) (downwardly departing where defendant was sole care provider for two teenage children, voluntarily attempted to make restitution prior to investigation, and assisted fully with criminal investigation).

### 2.    Mr. Palmieri's physical health and vulnerability to COVID-19

As part of its sentencing obligations, this Court must consider the need for the sentence imposed to "provide just punishment for the offense," 18 U.S.C. §3553(a)(2)(A), and the Court must consider the need for the sentence to provide Mr. Palmieri with medical care in the most effective manner, 8 U.S.C. §3553(a)(2)(D).  In this case, Mr. Palmieri's various health issues make him particularly susceptible to serious complications from COVID-19, including death, and sending him to prison would likely increase the likelihood of contracting the disease.  This would be contrary to §3553(a) and the goals of sentencing.

To determine the just punishment for Mr. Palmieri, the Court must consider how he will serve his prison time.  Currently, it is likely that he will spend it in lockdown conditions similar to solitary confinement.  Since March 13, 2020, BOP "modified its operations" to respond to the spread of COVID-19.[7]  Individuals "in every institution" are

---

[7] Fed. Bureau of Prisons, Fed. Bureau of Prisons COVID-19 Action Plan (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII.

"secured in their assigned cells/quarters to decrease the spread of the virus."[8] Family and friends are prohibited from visiting.[9]

Not only will Mr. Palmieri most likely be placed on lockdown and prohibited from seeing his two children, but he will be at grave risk of contracting COVID-19. CDC guidance, such as social distancing, is simply "impossible to achieve in our federal prisons"—particularly during a lockdown.[10] *See Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *23 (D. Conn. May 12, 2020) ("even with the measures that the Warden has put in place, due to the impossibility of adequate social distancing, confinement at FCI Danbury—due to the very structure of the facility—continues to pose a grave risk to vulnerable inmates' health").  Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings.  Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities.  According to the BOP, 89 inmates have

---

[8] Institution lockdown commenced on April 1, 2020 (Phase V) and was subsequently extended through May 18, 2020, (Phase VI) and again through June 30, 2020, (Phase VII). And, at some facilities, once someone tests positive for the virus, they are put in solitary confinement. *See, e.g.*, Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Declaration of Joanna Perales) (petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19); Class Action Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc-2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 6 (Declaration of Roger Duane Goodwin) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive for COVID-19).

[9] Fed. Bureau of Prisons, BOP Implementing Modified Operations, available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 28, 2020).

[10] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also* Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

died,[11] and it has been reported that over 70% of those tested by the BOP may have the virus.[12] Thus, because of COVID-19, any amount of time that Mr. Palmieri spends in prison will necessarily be more severe than is warranted. The Court should account for this by imposing a sentence that keeps Mr. Palmieri in the community.

Mr. Palmieri's age and medical issues are also significant in this regard.  "The stark reality is that 'avoiding exposure to COVID-19 is impossible for most detainees and inmates.'" *Durel B. v. Decker*, 2020 WL 1922140, at *2 (D.N.J. Apr. 21, 2020) (quoting *Cristian A.R. v. Thomas Decker*, Civ. No. 20-3600, 2020 WL 2092616, *2 (D.N.J. Apr. 12, 2020)).  According to CDC guidance, and as confirmed by Mr. Palmieri's treating physician, his various health conditions place him at high risk of severe illness or death if he contracts COVID-19 while in custody.[13]  And the BOP cannot effectively protect Mr. Palmieri from this risk.

A defendant without a criminal record, who pleads guilty to two tax misdemeanors, and positions his most significant asset—his house—to pay restitution, should not be sent to prison where he could contract a deadly disease.  That would be a sentence that is far greater than necessary under the circumstances presented here.

---

[11] Fed. Bureau of Prisons, BOP: COVID-19 Update: https://www.bop.gov/coronavirus/ (last visited June 29 2020).

[12] Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons have COVID-19*, AP News (Apr. 29, 2020) ("new figures provided by the Bureau of Prisons show that out of 2,700 tests systemwide, nearly 2,000 have come back positive, strongly suggesting there are far more COVID-19 cases left uncovered"), available at https://bit.ly/2AiMjrF.

[13] *See* CDC Guidance (updated June 25, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last viewed June 29, 2020).

### 3.   The goals of sentencing can have been achieved through the prosecution itself

A sentence below the advisory range is appropriate here because the purposes of sentencing have largely been achieved through Mr. Palmieri's very public prosecution, his conviction, the imposition of substantial restitution, and the attorney disciplinary sanctions that will follow his sentencing (which we hope will include no more than a reprimand, and not a suspension).  *See*, *e.g.*, *United States v. Redemann*, 295 F.Supp.2d 887, 894-896 (E.D. Wis. 2003) (downward departure warranted where purposes of sentencing, including punishment, specific deterrence and general deterrence already partially achieved through imposition on defendant of, *inter alia*, payment of substantial restitution, public shame, and collateral damage to family.); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) ("I am writing this opinion because from my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers—both prosecutors and defense counsel—as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant"); *id.* at 181 (discussing the concept of the "civil death" attendant to criminal convictions).

Based on these considerations, the Court would be justified in imposing a non-incarceration sentence that keeps Mr. Palmieri's family intact, does not threaten Mr. Palmieri's health by placing him in custody, or facilitate a complete "civil" death by ending his legal career.  *See Nesbeth*, 188 F. Supp. 3d at 181.

## II.   A SENTENCE OF PROBATION AND AN ORDER OF RESTITUTION, WITH A PERIOD OF HOME CONFINEMENT TO ALLOW MR. PALMIERI TO SUPPORT HIS CHILDREN, ATTEND TO HIS HEALTH NEEDS, AND PAY RESTITUTION TO THE IRS, WOULD SATSIFY THE GOALS OF 18 U.S.C. §3553(a)

The sentence to be imposed on Mr.  Palmieri must comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation."  *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also Gall*, 552 U.S. at 50, n. 6; 18 U.S.C. § 3553(a)(2)(A)-(C).  The sentencing statute also mandates consideration of the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. §3553(a)(2(D).

### A.   Just Punishment

The concept of "just punishment" under §3553(a)(2)(A) refers to the need for a defendant's punishment to fit the crime.  In the Senate Report accompanying the Sentencing Reform Act, the Act's sponsors explained:

> [Just punishment]—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

S. Rep. 98–225, 1984 U.S.C.C.A.N. 3182, 3258–59.

Here, just punishment can be achieved through a probationary sentence that imposes restrictions on Mr. Palmieri's liberty and allows the Court to mete out more serious penalties in the event of future tax noncompliance.  An order of restitution,

which will result in a lien being filed on Mr. Palmieri's property to secure payment of his

tax debt is likewise "just," given that the crime was financial in nature but it involved

nonpayment, and not more serious fraudulent conduct, or theft, which would warrant

more significant punishment.

     **B.**    **Deterrence**

Next, §3553(a)(2)(B) instructs the Court to consider whether the sentence

provides adequate deterrence to criminal conduct.  This concept embodies two related

concepts: general deterrence (deterring the public from crime) and specific deterrence

(deterring the defendant from future criminal behavior).

In this case, general deterrence does not mandate a sentence of incarceration.

The National Institute of Justice—the research, development and evaluation agency of

the U.S. Department of Justice—has noted the following about deterrence theory:

1.    "The certainty of being caught is a vastly more powerful deterrent than the punishment."

2.    "Sending an offender to prison isn't a very effective way to deter crime."

3.    "Police deter crime by increasing the perception that criminals will be caught and punished."

4.    "Increasing the severity of punishment does little to deter crime."[14]

In other words, the certainty of punishment has proven to be the strongest

deterrent, and imprisonment is not an effective deterrent.  Applying this research,

deterrence is accomplished in this case, first and foremost, by the fact of Mr. Palmieri's

---

[14] *See* NIJ, "Five Things About Deterrence (citing Daniel Nagin, "Deterrence in the 21st Century," in *Crime and Justice in America 1975-2025* (ed. Michael Tonry, Univ. Chicago Press, 2013), available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.  The fifth finding about deterrence—that "[t]here is no proof that the death penalty deters criminals"—is not applicable here.

prosecution.  The public perception will be that one who does not pay his taxes will be caught and prosecuted.

As for specific deterrence, the Court can see already that this criminal prosecution has effectively scared Mr. Palmieri straight, and he is doing everything he can to comply with his tax obligations.  A sentence of imprisonment is not needed to deter him from willfully failing to pay in the future.  In fact, it would likely put him in a worse financial position and make it more difficult for him to pay his taxes.

### C.    Protection of the Public

Pursuant to 18 U.S.C. §3553(a)(2)(C), the Court must consider whether a particular sentence is needed "to protect the public from further crimes of the defendant."  Given Mr. Palmieri's age, his lack of any prior contact with the criminal justice system, and the nature of his tax offense, this factor does not weigh in favor of imposing a custodial sentence.

### D.    Rehabilitation

Pursuant to 18 U.S.C. §3553(a)(2)(D), courts also must consider the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  According to CDC guidance, and as confirmed by Mr. Palmieri's treating physician, Mr. Palmieri's various health conditions place him at high risk of severe illness or death if he contracts COVID-19 while in custody.   As discussed above, the BOP cannot effectively protect Mr. Palmieri from this risk.  Accordingly, a non-custodial sentence that allows Mr. Palmieri to receive needed medical treatment, reduce his risk of infection, and address his mental health needs (depressions and anxiety) is more consistent with this goal of sentencing.

31

**Conclusion**

Given Mr. Palmieri's personal and financial situations, a sentence of imprisonment in this case will lead to Mr. Palmieri losing his license and law practice, his house (which is now in foreclosure, but stayed pursuant to a forbearance agreement), and the ability to care for his children, for whom he is solely responsible. This punishment would be severe and life-altering for Mr. Palmieri and those who depend on him, and greater than necessary for a tax misdemeanor disposition involving an offender who has worked to bring his tax situation into compliance and has agreed to pay his taxes owed using future income and his only significant available asset: his home. Instead, the Court should downwardly depart or impose a non-Guidelines sentence of probation, with a special condition of home confinement, and order full restitution to the IRS, as agreed to in the plea agreement.

Respectfully submitted,

*/s/ Robert M. Frost, Jr.*
Robert M. Frost, Jr. (ct 19771)

FROST BUSSERT, LLC
350 Orange Street, Suite 100
New Haven, CT 06511
Tel:        (203) 495-9790
Fax:        (203) 495-9795
Email:      rmf@frostbussert.com

ATTORNEY FOR DEFENDANT

## **CERTIFICATION**

I hereby certify that on this date a copy of the foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

Dated at Guilford, Connecticut on this 29th day of June, 2020.


*/s/ Robert M. Frost, Jr.*
Robert M. Frost, Jr.